UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x

In re:                            :

MARC J. PEARLMAN              :     BK No. 04-12257
            Debtor                       Chapter 7
                                  :

SAUNDERS REAL ESTATE CORPORATION
            Plaintiff         :

v.                            :     A.P. No. 04-1064

MARC J. PEARLMAN              :
            Defendant

- - - - - - - - - - - - - - - - - -x


## <u>OPINION AND ORDER DENYING DISCHARGE</u>

APPEARANCES:

        Victor Bass, Esq.
        Attorney for Plaintiff
        BURNS & LEVINSON LLP
        125 Summer Street
        Boston, Massachusetts 02110

        Peter Berman, Esq.
        Attorney for Debtor/Defendant
        RASKIN & BERMAN
        116 East Manning Street
        Providence, Rhode Island 02906




**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 04-12257; A.P. No. 04-1064

This bankruptcy case was filed in July 2004, and on December 17, 2004, Saunders Real Estate Corporation ("Saunders"), filed a Complaint under Section 727(a)(3) of the Bankruptcy Code, seeking denial of discharge, on the ground that Marc J. Pearlman (the "Debtor") failed to maintain books and records from which his financial condition might be ascertained. After an extended period of pre-trial activity, including a change of counsel by Saunders, the matter was scheduled for hearing on April 26, 2006. At the conclusion of a three day trial on the merits, Saunders, with leave of Court and over Pearlman's objection, amended its complaint[1] to include Section 727(a)(2), transfer or concealment of property with intent to hinder, delay, or defraud, and Section 727(a)(4), making a false oath or account.

Based on the following discussion, findings of fact, and conclusions of law, the Debtor's discharge is **DENIED**, under all three counts of the Complaint.

<u>**BACKGROUND**</u>

Pearlman and his wife, Anna Maria Pearlman, live at 6 Ralls Drive, Cranston, Rhode Island. Mr. Pearlman graduated from the Massachusetts Institute of Technology in 1951 with a degree in

---

[1] *See Saunders Real Estate Corp. v. Pearlman (In re Pearlman),* 360 B.R. 19 (Bankr. D.R.I. 2006) (Decision and Order Granting Post Trial Motion to Amend Complaint, Doc. 76).

1

BK No. 04-12257; A.P. No. 04-1064

civil engineering, and from Suffolk Law School in 1979, with a law degree. During the 1950s, '60s, '70s and '80s, Pearlman owned and operated various businesses, some involving multi-million dollar construction projects. In the late '80s, Pearlman acquired a partnership interest in Wequonnoc Village Associates ("WVA"), a company involved in the construction and operation of a public housing project. At about the same time, the Pearlmans formed Newbury Kitchens and Bath, Inc. ("NKB"), in the business of designing and selling kitchens, baths and related products. Mr. and Mrs. Pearlman each own 50% of the stock of NKB.

In late 1997, Saunders obtained a state court judgment against Pearlman for unpaid rent in the amount of $68,849, plus interest, (the "Judgment"). No payments were made on this obligation, and more than five years later, Saunders levied execution against Pearlman's assets. (P. Ex. A). In April 2003, Pearlman was court ordered to pay Saunders $800 per month until the Judgment was paid in full. Pearlman, or NKB on his behalf, made 10 payments, and then stopped. Another year passed, and after yet another hearing, Superior Court Associate Justice Stephen Fortunato adjudged Pearlman in contempt and ordered him to be incarcerated at the Rhode Island Adult Correctional Institution until he provided the Court with a reasonable plan to pay the Judgment. As for Pearlman's

2

BK No. 04-12257; A.P. No. 04-1064

alleged inability to pay *anything* to reduce the debt, Judge

Fortunato took a dim view of his testimony, saying:

> I believe that the plaintiff has shown by clear and
> convincing evidence that you are in contempt of the Court
> Order issued in April of last year... You continue to run
> a going business on Newbury Street and continue to own
> commercial property and real property ... and those
> properties have equity, or, to put it another way, you
> have some equitable interest in both of those properties.
> You have been an apparently successful and capable
> businessman for decades, and now you come into this Court
> with no papers and a considerable amount of "I don't
> knows" as you answer legitimate, straightforward and
> somewhat simple questions.
>
> Accordingly, I find your testimony not to be credible so
> far as your stating a total and complete inability to pay
> the amount required or some substantial portion of the
> amount required of the last Order. ... This notion that
> you're going to jerk the plaintiff around is not a good
> one. It will not be allowed by the Court.

P. Ex. H., at 10-11.

The incarceration order was stayed for 30 days to allow

Pearlman time to liquidate enough of his assets to pay the Saunders

claim. At the same time, Judge Fortunato warned Pearlman: "[i]f you

do not do that, the next time you come to court you should bring

your toothbrush with you because you'll be on your way to the ACI."

*Id.* at 12. Pearlman did not comply with the judge's order. Instead,

on the day before his scheduled hearing before Judge Fortunato,

Pearlman filed this Chapter 7 bankruptcy case.

3

BK No. 04-12257; A.P. No. 04-1064

## DISCUSSION AND ANALYSIS

The litigation in this Court is recounted below.[2] In his bankruptcy papers, Pearlman listed Saunders as a judicial lien creditor in the amount of $100,000. Except for the home mortgage, Saunders is by far the largest creditor in this case. On his Schedule B – Personal Property, Pearlman included two non-exempt assets: a 50% interest in NKB, with a value of "0.00," and an interest in WVA, with the value listed as "unknown." The only income disclosed was Social Security in the amount of $1,600 per month. Mrs. Pearlman's income was listed as $0.00. "Schedule J – Current Expenditures of Individual Debtor(s)", showed monthly expenses of $1,750, but gave no details of mortgage payments, real estate taxes, home maintenance, car payments or insurance. There is, however, a footnote that "Mortgage payment is paid by Newbury Kitchens and Bath Inc." (P. Ex. G).

Saunders argues that discharge should be denied (A) under Section 727(a)(2), because the "destruction of NKB's obligation to Pearlman or its conversion to paid up capital (if that occurred) constituted a violation" of that Section (Plaintiff's Requested Findings of Fact and Conclusions of Law, Doc. No. 91, at 15); (B) under Section 727(a)(4), on the ground that

---

[2] This Opinion and Order constitutes the findings of fact and conclusions of law required by Fed. R. Civ. P. 7052 and 9014.

4

BK No. 04-12257; A.P. No. 04-1064

Debtor swore false oaths in filing his schedules and
SOFA,[3] and testified falsely at his § 341 meeting, with
respect to his income, major assets (specifically
including his investments and interests in NKB and WVA
and distributions from them), and his financial history,
within the meaning of 11 U.S.C. § 727(a)(4). Such false
statements were intentional, pervasive and material.

*Id.*; and, finally, under Section 727(a)(3) for failure to produce

financial records to explain "several essential mysteries" of his

financial existence. *Id.* at 9. Each issue is addressed and

discussed in detail below.

## A. Transfer, Destruction or Concealment of Assets – Section 727(a)(2)

Section 727(a)(2) provides:

The court shall grant the debtor a discharge, unless –
(2) the debtor, with intent to hinder, delay, or defraud
a creditor ... has transferred, destroyed, or concealed,
or has permitted to be transferred, destroyed, or
concealed –
(A) property of the debtor, within one year, before the
date of the filing of the petition; or
(B) property of the estate, after the date of filing of
the petition.

11 U.S.C. § 727(a)(2). Under this Section there must be actual

intent, which may be inferred "from the facts and circumstances

surrounding [the debtor's] actions." *Citizens Bank of Massachusetts*

*v. Marrama (In re Marrama)*, 331 B.R. 10, 15 (D. Mass. 2005), *aff'd*,

445 F.3d 518 (1st Cir. 2006).

---

[3] Statement of Financial Affairs ("SOFA").

5

BK No. 04-12257; A.P. No. 04-1064

NKB's financial records and tax returns, most of which were produced only two weeks before the date initially set for trial, show that in the years preceding this bankruptcy, NKB owed the Pearlmans amounts ranging from $88,000 to almost $350,000. Pearlman was not able to discuss the details of such large receivables, with one exception. In December 1998, after Saunders obtained judgment against them, the Pearlmans refinanced their home mortgage, borrowing $211,250. (D. Ex. 9). Of that amount, $110,399 was used to pay off a debt to Mercantile Bank. The remaining funds ($100,850) were allegedly used to fund NKB. No promissory notes or other business records relating to the transaction were produced, and Pearlman testified that none existed.

The NKB/Pearlman loan structure fluctuated from year to year. At 1998 year end, NKB owed Pearlman $347,988 (P. Ex. M, NKB 1998 Tax Return, at 4, line 19), at the end of 2001, it was $333,801 (P. Ex. N, NKB 2001 Tax Return, at 4, line 19), and at the end of 2002, NKB owed Pearlman $276,505. (P. Ex. O, NKB 2002 Tax Return, at 4, line 19). From that point forward, the record is unclear and contradictory. Curiously, NKB's 2003 tax return shows that at the beginning of 2003, NKB owed Pearlman only $88,505 - $188,000 less than the balance at the end of 2002. (P. Ex. P, NKB 2003 Tax Return, at 4, line 19). How does something like this happen? In this case it happened as follows: Pearlman's accountant, Sonia

6

BK No. 04-12257; A.P. No. 04-1064

Stingo, who is also his sister-in-law testified that, for tax purposes, the 2002 $276,505 loan receivable had been partially reclassified as an equity contribution. However, instead of filing an amended 2002 tax return, it was decided to reflect the action in NKB's 2003 tax return. Indeed, the 2003 NKB tax return shows an increase in additional paid-in capital from $0 as of the end of 2002, to $250,000 at the beginning of 2003. *Id.* at 4, line 23. No explanation of the source of the additional $62,000 was provided. Pushing the envelope of truth and reasonableness to its limit, that tax return was not filed until September 2004, several months after the bankruptcy case was filed. Adding to the doubt about the validity of this transaction, there are no contemporaneous records in 2002, 2003, or 2004, of this purported reclassification. On the contrary, NKB's pre-bankruptcy financial records dated February 17, 2004, show that as of the end of 2003, NKB still owed shareholders (i.e., the Pearlmans) $215,933 (D. Ex. 48, at 1, accounts 2-2100 and 2-2200), and the earliest corporate records of the alleged re-characterization was in September 2005, a full year after the event. (D. Ex. 63). Even this accounting sleight of hand, however, did not completely extinguish the loan. NKB's 2003 tax return shows that the year began with an $88,505 balance payable to Pearlman, and ended with a balance of $25,053. (P. Ex. P, NKB 2003 Tax Return, at 4, line 19). This asset was also purportedly

7

BK No. 04-12257; A.P. No. 04-1064

extinguished, but, again, only according to a post-bankruptcy tax return filed by NKB in 2004. (D. Ex. 67, NKB 2004 Tax Return, at 4, line 19). By the end of 2004, the roles were reversed and Pearlman owed NKB $22,934. (*Id.* at 4, line 7). With no paper trail of any of these alleged transactions, it is not possible to determine whether the $48,000 swing during 2004 occurred before or after the filing of the Chapter 7 case. In addition, the item does not appear on the bankruptcy schedules, either as a debt owed by NKB to the Pearlmans, or vice versa, and Pearlman offered no clarification. The most important part of all this is that the available pre-bankruptcy financial records show that NKB owed Pearlman in excess of $200,000 when he filed this bankruptcy case.

At trial, Pearlman was unable to explain either the source of any funds loaned by him to NKB, or the disposition of funds transferred to him by NKB. Instead, he consistently referred all such questions to the accountant. The following exchange on April 26, 2006,[4] is illustrative:

> **Debtor:** "I was not aware of the accounting procedures or practices at the time I answered original questions in 2004."
> **Question:** "So you are trying, you are suggesting to me that at the time you filed bankruptcy you didn't know that you had received those loans from [NKB] or that you had had loans from you to it paid off?

---

[4] The Court quotes testimony based on its notes made at trial, as well as audio recordings, as the parties have not submitted a transcript as part of the record.

BK No. 04-12257; A.P. No. 04-1064

**Debtor:** That's what I am saying.

**Question:** You just indicated that during the course of the year in which you filed bankruptcy you received $48,000 approximately in loan repayments and/or loans from Newbury Kitchens and Baths. Is that correct?

**Debtor:** I did not know they were loan repayments. I answered honestly, as best I understood the whole thing. I leave that up to the accountant as to how they classify different things and I just did not understand it any differently than the way I answered it.

**Question:** Mr. Pearlman, where did that $48,000 that you got from Newbury Kitchens and Baths, in the year that you filed bankruptcy, go?

**Debtor:** I don't even recall receiving it, but I saw it there, I assume to pay bills.

**Question:** But you don't have any records of the receipt or the expenditure of that $48,000?

**Debtor:** I don't know if there are records or not. I don't know of them.

**Question:** But you did say ... at that 341 meeting that there was no written agreement with respect to those loans or their repayment between you and the corporation.

**Debtor:** That's correct and that was accurate. At least, I have never seen any and never signed any."

...

**Question:** So in 1998, Newbury Kitchens and Baths owed you almost $300,000, but by the time 2004 was done it paid that loan off in full, and loaned you another $23,000. Is that correct?

**Debtor:** I don't know if that's correct or not, but my accountant... That's accounting procedure, which I cannot explain or understand fully, but my accountant can explain."

**Question:** If the corporation owed you $347,988 in 1998 and that loan was totally repaid by some time in 2004 then you received, you and your wife as stockholders of Newbury Kitchens and Bath, received approximately $350,000 ... in round numbers repayment of loans from Newbury Kitchens and Baths? Where did that $350,000 go?

**Debtor:** Certainly, I did not receive it, but I do understand that in the accounting classifications of loans and repayments of loans, ..., which is something that I cannot explain to you, I do not fully understand it, but the accountant can. And I depended on the

9

BK No. 04-12257; A.P. No. 04-1064

accountant to do that kind of thing. ... Did I receive this $350,000? The answer is no."

Property of the estate includes the debtor's right of action to collect accounts receivable. *See Crysen/Montenay Energy Co. v. Esselen Associates, Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1101 (2d Cir. 1990), and this undisclosed receivable was clearly property of this bankruptcy estate. Contrary to the fair and straightforward conduct required of debtors seeking a discharge of their debts, Mr. Pearlman simply presented the Trustee and creditors with a *fait accompli,* by declaring in NKB's 2003 federal tax return that the company owed him $188,000 less at the beginning of 2003, than at the end of 2002. The accountant, who represents both Pearlman and NKB, testified that sometime in 2003 she recommended to the Pearlmans that, for tax purposes, this loan be reclassified as an equity contribution. There is no documentation or reasonable explanation as to when or why this decision to reclassify was made, and there is no credible evidence that such a reclassification was ever considered until September 2005. The only reasonable inference is that the Debtor failed to disclose a large asset when his case was filed, and thereafter purported to transform it into a liability, while the case was pending – a strategy that lacks both credibility and support.[5]

---

[5]  In its Amended Complaint (Docket No. 80), Saunders included only § 727(a)(2)(A) (transfer or destruction of an asset of the

BK No. 04-12257; A.P. No. 04-1064

Since 1998, the Debtor avoided paying Saunders by hiding and/or misrepresenting the value of his assets. And his habit of passing along nearly all financial questions to the accountant, his failure to explain any of the many serious questions about his financial dealings, and the absence of credibility in his various unsupported contentions, are all sufficient reasons for the Debtor not to receive a discharge under Section 727(a)(2).

**B. False Oath - Section 727(a)(4)(A)**

This Section provides:

The court shall grant the debtor a discharge, unless -
(4) the debtor knowingly and fraudulently, . . .
(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). "The plaintiff bears the burden of proving that the defendant made a false oath knowingly and fraudulently, then 'the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged.'" *Morse v. Marcelle (In re Marcelle*), 07-1197-MWV, 2008 WL 4814116 *4 (Bankr. D.N.H. Oct. 30, 2008), *citing Boroff v. Tully*,

---

debtor within one year prior to bankruptcy), and made no reference to § 727(a)(2)(B) (transfer or destruction of an asset of the estate after the bankruptcy is filed). We do not believe such mislabeling of a legal theory by the Plaintiff is fatal to the complaint, in the circumstances of this case. *See Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439, 446 (1st Cir. 2000). If, on the facts disclosed, a party is entitled to relief, it is the duty of the court to award it. *New Amsterdam Casualty Company v. Waller,* 323 F.2d 20, 24-25 (4th Cir. 1963). In the instant case, the record contains more than sufficient proof to deny the debtor's discharge under § 727(a)(2)(B).

BK No. 04-12257; A.P. No. 04-1064

818 F.2d 106, 110 (1st Cir. 1987). "Because a debtor rarely gives direct evidence of fraudulent intent ... intent to defraud a creditor can [and often may *only*] be proved by circumstantial evidence." *Marrama v. Citizens Bank of Massachusetts (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006) (bracketed language added). "Reckless indifference to the truth ... has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *Tully*, 818 F.2d at 112.

This Court is satisfied that the Debtor intentionally made false representations in his schedules, statements of financial affairs, and in his testimony at the 341 meeting and at trial, with respect to his income, the value of non-exempt assets, and receivables owed to him by NKB. These generally referenced transgressions are discussed in detail below.

## 1. *Debtor's income.*

The only income originally listed on the Debtor's Schedule I was Social Security, in the amount of $1,600 per month. However, documents eventually obtained revealed that the Debtor had been regularly receiving and transferring large sums of cash since 1997, with no explanation as to what these transactions were about.

Pearlman's Statement of Financial Affairs, as initially filed (P. Ex. G), states:

12

BK No. 04-12257; A.P. No. 04-1064

## 1. Income from employment or operation of business

AMOUNT          SOURCE

    0.00         2004-unknown

    0.00         2003-unknown

13,589.00         2002

## 2. Income other than from employment or operation of business

AMOUNT          SOURCE

    0.00         2004-unknown

    0.00         2003-none other than Social Security

    0.00         2002-unknown

At the Section 341 meeting in August 2004, Pearlman testified:

**Trustee Pisaturo:** And you don't get any salary from Newbury Kitchens and Baths?
**Pearlman:** No sir.
**Trustee Pisaturo:** Your wife does not either?
**Pearlman:** She used to when we were able to, but she hasn't in a number of years.
**Trustee Pisaturo:** And you haven't received any income from Newbury Kitchen and Baths in a number of years?
**Pearlman:** Correct.
**Attorney Berman:** It pays as I put in a footnote there, it pays the mortgage.
**Trustee Pisaturo:** Ok. Yep. It doesn't actually, well ok. Ok, in the past 12 months, have you received, other than the fact that Newbury Kitchens and Baths pays your mortgage on your house, is that accurate?
**Pearlman:** Yes.
**Trustee Pisaturo:** And other than that, has it made any disbursements to you in the past 12 months? Distributions of any kind?
**Pearlman:** No.
**Trustee Pisaturo:** Loan payments?
**Pearlman:** No.
**Trustee Pisaturo:** Salaries?

13

BK No. 04-12257; A.P. No. 04-1064

**Pearlman:** No.
**Trustee Pisaturo:** Capital account ... return of capital contributions?
**Pearlman:** No.
**Trustee Pisaturo:** No. What about to your wife?
**Pearlman:** Nope.
**Trustee Pisaturo:** Salary? Loan Repayments?
**Pearlman:** Not in the past 12 months.

P. Ex. E at 22-23.

At the continued Section 341 meeting on October 18, 2004, Pearlman testified that he had not received, or did not remember receiving any salary, dividends or other distributions from NKB, going back 10 years. (P. Ex. F at 16.) Then, just two days before commencement of the trial, Pearlman filed an amended statement of financial affairs (P. Ex. L), declaring:

**1. Income from employment or operation of business**

| AMOUNT | SOURCE |
|---|---|
| 79,466.00 | 2004 |
| 30,196.00 | 2003 ($30,196 consists of wife's wages of $11,200 and $18,811 in profit) |
| 13,589.00 | 2002 |

**2. Income other than from employment or operation of business**

| AMOUNT | SOURCE |
|---|---|
| 19,027.00 | 2004-Social Security |
| 185.00 | 2003-Interest |
| 93.00 | 2002-Interest |
| 65.00 | 2004-Interest |

14

BK No. 04-12257; A.P. No. 04-1064

340.00        2002-Capital Gains

19,000.00     2003 (Social Security approximately $19,000)

19,000.00     2002 (Social Security approximately $19,000)

Pearlman's Schedules I and J, however, were not amended, and there is no explanation for why these last minute revelations were not provided earlier.  The eve-of-trial production of documents and the resulting new questions raised, only further confuse Pearlman's true financial situation, *i.e.,* the Debtor's acknowledgment that his personal checking account statements (D. Ex. 1) for the six months prior to bankruptcy, show more than $16,000 deposited from sources which Pearlman could not, or would not, explain.

Cross-examination also revealed that the Debtor issued a number of checks between 1999-2002, totaling approximately $70,000, from NKB to Pearlman, his wife, or "cash" – some signed on behalf of NKB by Pearlman, and others by his wife. (P. Ex. J.) The Debtor was unable to shed any light on these transfers, and no records or explanations were offered to fill in any of the information gaps. These checks severely damage Pearlman's contention that neither he nor his wife received any distributions from NKB "for 10 years."

The tardily filed Amended Statement of Financial Affairs raises more questions than it answers. In 2004, for example: the Debtor's income was changed from "$0.00 - unknown" to $98,493, of which only $19,027 was from Social Security. (P. Ex. G & L, SOFA

15

BK No. 04-12257; A.P. No. 04-1064

questions 1 & 2). At trial, the Debtor also acknowledged receiving $25,053 in loan repayments (D. Ex. 67, line 19), and that $22,934 was loaned to him from NKB (*Id.*, line 7), showing total transfers from NKB to the Debtor of $127,453.

With no explanation for these or any other of his financial activities, the only reasonable conclusion to be drawn from the record we have is that the Debtor made false representations or withheld information regarding virtually every material financial issue in this case.

### 2. *Debtor's interest in NKB.*

Pearlman originally stated the value of his interest in NKB as $0.00, and those schedules have not been amended. However, as noted above, the Pearlmans received almost $70,000 from NKB between 1999 and 2002, and in 2004 they received from NKB at least $127,453 in income, loan repayments, and new loan proceeds. Ms. Stingo conceded that NKB was able to reduce its obligations to Pearlman in 2002 by $57,296 (P. Ex. N, at 4, line 19), in 2003 by $63,452 (P. Ex. P., at 4, line 19), and in 2004 by $47,987. (D. Ex. 67, at 4, lines 19 and 7). She also confirmed that the business was profitable in each of those years even after paying most of the Pearlmans' personal living expenses. (P. Exs. N, O, and P, and D. Ex. 67). Therefore, Pearlman's assertion that NKB had no value was false, even before he compounded that statement with his assertion at the Section 341

16

BK No. 04-12257; A.P. No. 04-1064

meeting, that for more than ten years no distributions had been made by NKB to either Pearlman or his wife.

**3. *Debtor's interest in WVA.***

Pearlman's Schedule B represents that his ownership interest in WVA was as a limited partner, with the value "unknown". (D. Ex. G), and at the Section 341 meeting he testified that his investment was "$6,000-$10,000, combined, in WVA and another partnership for shelter, and once in a while they may have thrown off a few hundred dollars." (P. Ex. E, at 29-30.) This contention is flatly contradicted by the documentary evidence, and is given no weight. WVA's tax returns (Schedule K-1) for 2002, 2003 and 2004 (D. Exs. 3, 4, and 24) show that Pearlman's investment in WVA, alone, was more than $40,000. Moreover, he was a general partner of WVA - not a limited partner - and as the general partner Pearlman not only had check signing authority, but he exercised it regularly (according to the limited period(s) for which records were produced) by issuing checks of at least $134,107 from WVA to NKB or to himself personally, and at least $73,000 from NKB to WVA. (P. Ex. I.) There are no supporting business records for any of these checks, and, again, the Debtor had no explanation for any relevant questions put to him. Pearlman's statements as to the amount of his income, the value of his non-exempt assets (his interest in NKB and WVA) and his failure to disclose the receivable from NKB of more

17

BK No. 04-12257; A.P. No. 04-1064

than $200,000 are all found to be materially false, not only

according to his sworn schedules and SOFA, but also by his § 341

testimony, and at trial.

## C. Section 727(a)(3)

Section 727(a)(3) provides:

The court shall grant the debtor a discharge, unless -
(3) the debtor has concealed, destroyed, mutilated,
falsified, or failed to keep or preserve any recorded
information, including books, documents, records, and
papers, from which the debtor's financial condition or
business transactions might be ascertained, unless such
act or failure to act was justified under all of the
circumstances of the case.

11 U.S.C. § 727(a)(3). Section 727(a)(3) requires the objecting

party to establish: "(I) that the debtor 'concealed, destroyed,

mutilated, falsified, or failed to keep or preserve any recorded

information; and (ii) that the recorded information was information

'from which the debtor's financial condition or business

transactions might be ascertained.'" *Lassman v. Keefe (In re Keefe)*,

380 B.R. 116, 120 (Bankr. D. Mass. 2007). Once the objecting party

introduces evidence of these two elements, it is the debtor's burden

to show that such act or failure to act was justified under the

circumstances of the case. *Id*. "[A] creditor need not prove a

fraudulent intent, but only that the debtor unreasonably failed to

maintain sufficient records to adequately ascertain his financial

situation." *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 70

(1st Cir. 2004). "It is a question in each instance of

18

BK No. 04-12257; A.P. No. 04-1064

reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies." *Id*. at 68, quoting *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992). Therefore, "[w]hile a debtor may justify his failure to keep records in some cases, a discharge may be granted only if the debtor presents an accurate and complete account of his financial affairs." *Id*. "Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 723(a)(3)." *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 175 (B.A.P. 1st Cir. 2000). "On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs." *Id*. (citation omitted). "Because the standard for a claim of failure to maintain records is based on 'reasonableness under all the circumstances,' the education and sophistication of the Debtor is relevant." *Schifano*, 378 F.3d at 68. Mr. Pearlman has an MIT undergraduate education, a law degree, and more than 40 years of business experience.

The evidence in this proceeding (and the absence of answers from the Debtor) is that he used his corporate entities to move

BK No. 04-12257; A.P. No. 04-1064

money in amounts greatly exceeding what his schedules and testimony reflect, with no way to ascertain his true financial situation, or to reconstruct his business affairs. The Debtor has offered nothing credible to fill the voids and unanswered questions regarding his business and financial activities.

### CONCLUSION

In furtherance of the Bankruptcy Code's fresh start policy, exceptions to discharge are narrowly construed. *Schifano*, 378 F.3d at 66, quoting *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir. 1997). However, the First Circuit Court of Appeals has noted repeatedly that "the very purpose of certain sections of the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Id*.

Based upon the entire record, including insurmountable credibility issues created solely by the Debtor, the absence of records and supporting documentary evidence, the arguments, and the applicable statutory authority and controlling case law, the Court concludes that Saunders' Objection to the Debtor's discharge in this case should be, and hereby is **SUSTAINED**.

Enter judgment consistent with this Opinion.

20

BK No. 04-12257; A.P. No. 04-1064

Dated at Providence, Rhode Island, this      16th      day of

September, 2009.

_____

Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 9/16/2009

21